IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 25, 2012 Session

# BRENDA GRIFFITH, NEXT OF KIN OF DECEDENT, BOB GRIFFITH v. DR. STEPHEN GORYL AND UPPER CUMBERLAND UROLOGY ASSOCIATES, P.C.

Appeal from the Circuit Court for Putnam County
No. 07J0276     Amy V. Hollars, Judge

No. M2011-02730-COA-R3-CV - Filed October 31, 2012

In this medical malpractice, wrongful death action the plaintiff alleges the defendant physician, a urologist, failed to timely diagnose and treat the decedent's bladder cancer which caused his death. At the close of the plaintiff's case in chief, the defendant moved for a directed verdict. The trial court held that the plaintiff's only medical expert witness erroneously defined the standard of care and, upon that basis, excluded his testimony concerning the standard of care and breach thereof. With the exclusion of the plaintiff's only expert testimony, the trial court held that the plaintiff failed to establish a prima facie case for medical malpractice and granted the motion for a directed verdict. We have determined the plaintiff's medical expert did not erroneously identify the standard of care, he is competent to testify and, thus, the trial court erred in excluding his testimony and directing a verdict in favor of the defendant. We, therefore, reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Michael D. Galligan, Susan N. Marttala, and John P. Partin, McMinnville, Tennessee, for the appellant, Brenda Griffith, next of kin of decedent, Bob Griffith.

Daniel H. Rader III, Lane Moore, and Daniel H. Rader IV, Cookeville, Tennessee, for the appellee, Dr. Stephen Goryl.

# OPINION

Bob Griffith was diagnosed with a "low grade transitional cell bladder tumor" in late 2002, at the age of 56. In April 2004, Mr. Griffith came under the care of Dr. Stephen Goryl ("Dr. Goryl" or "Defendant"), a board-certified urological surgeon practicing in Cookeville, Tennessee, at Upper Cumberland Urology Associates, P.C. ("UCUA"). Mr. Griffith's health severely deteriorated under Dr. Goryl's care, and in September 2006, Dr. Goryl referred Mr. Griffith to Vanderbilt University Medical Center. Doctors at Vanderbilt diagnosed Mr. Griffith with "invasive high grade urthelial carcinoma" with metastasis to the lymph nodes, which Dr. Goryl had not detected.

Mr. Griffith and his wife, Brenda Griffith, commenced this action against Dr. Goryl on October 18, 2007, in the Putnam County Circuit Court.[1] In the first complaint they alleged medical malpractice by Dr Goryl in failing to timely diagnose and treat bladder cancer in Mr. Griffith. Dr. Goryl filed a timely answer denying that he committed malpractice or that his acts or omissions caused Mr. Griffith's death.

On February 4, 2008, Mr. Griffith died from the cancer that had originated in his bladder. Ms. Griffith ("Plaintiff") filed a Suggestion of Death and Amended Complaint following Mr. Griffith's death.[2]

Three years later, on November 14, 2011, the case against Dr. Goryl went to trial. The only medical expert witness identified by Plaintiff in pre-trial discovery was Dr. James Gilbert Foster, Jr. ("Dr. Foster"), a board-certified urologist and surgical oncologist who practiced in Atlanta. Prior to testifying before the jury, Dr. Foster was questioned by defense counsel regarding his competency. After answering numerous questions regarding his competency to testify as an expert witness concerning the matters at issue, Dr. Foster testified as follows with regard to Dr. Goryl's treatment of Mr. Griffith:

> It is my opinion that Dr. Goryl breached the standard of care in this case by failing to aggressively evaluate the cause of Mr. Griffith's tremendous suffering of bladder pain, spasm, and bleeding, particularly during the summer and fall of 2006. The biopsy performed did not note the presence of muscularis and was not thorough enough, . . . given Mr. Griffith's complaints and symptoms and previous history of a current transitional cell carcinoma of the

---

[1]Dr. Goryl's medical group, UCUA, was also a named defendant; however, on November 14, 2011, Plaintiff voluntarily dismissed all claims against UCUA.

[2]Dr. Goryl retired from medical practice in 2008.

bladder. Dr. Goryl did not perform urologic – urine cytology. Routine tests that would have been performed and which would – [were] required by the standard of care in Cookeville, Tennessee. Dr. Goryl did not pay attention to the complaints and symptoms of the patient given the known history of recurrent transitional cell carcinoma of the bladder.

. . .

. . . It is my understanding that Mr. and Ms. Griffith requested further testing to be done during 2006 when Mr. Griffith appeared to deteriorate right before their eyes. They specifically requested that a CAT scan be performed or a CT scan be performed. Dr. Goryl assured them that that test was unnecessary and assured Mr. and Ms. Griffith repeatedly that Mr. Griffith did not have bladder cancer causing these problems.

Following voir dire of Dr. Foster, defense counsel moved to exclude Dr. Foster from testifying on the ground he was not familiar with the standard of care applicable to urologists practicing in Cookeville, Tennessee from 2004-2006. The trial court denied Defendant's motion, and Plaintiff proceeded with her case-in-chief by calling Dr. Foster to the witness stand.

Upon direct examination, Dr. Foster first reiterated his medical qualifications, including that he was a board-certified urologist and had over thirty years of experience. He was licensed and certified in the same specialty as Dr. Goryl, and practicing in Atlanta, Georgia from 2004 to 2006. Dr. Foster earned his medical degree at Emory University School of Medicine in 1973. He was a general surgery resident at Vanderbilt University affiliated hospitals from 1973-1975 in preparation for his urology specialization, which he completed at Emory University in 1978. He testified that he had been an actively practicing, board-certified urologist since 1980. He is the member of several national and regional medical associations, and has been on the clinical teaching staff of Emory University for over fifteen years. He testified that he has treated between three and four hundred bladder cancer patients during his career.

Dr. Foster testified that he was familiar with the standard of care in Cookeville, Tennessee, during the time period between 2004 and 2006,[3] and that, in his opinion, Dr.

_____

[3]In his affidavit dated November 16, 2011, Dr. Foster stated:

"Cookeville Regional Hospital is a 247-bed regional referral center in the heart of the Upper Cumberland in middle Tennessee. It has over 120 physicians providing care in

(continued...)

Goryl breached the standard of care for urologists in several significant ways in his care of Mr. Griffith that caused Mr. Griffith's bladder cancer to progress to the point that it was not treatable.

Dr. Foster testified at length about how bladder cancer, if detected while superficial, is a highly treatable form of cancer with a 98% five-year survival rate. He further testified that after a tumor is removed, the patient must be under active surveillance for recurrences, and he explained the various tests and tools available for such surveillance. Specifically, he testified that once a tumor is removed from the bladder, the patient must be "cystoscoped" every three months for the first year, then once every six months for the second year, then once a year for the rest of the patient's life.[4]

If any cancerous growth is detected during the cystoscope, Dr. Foster explained, "you need to note where it is, how big it is and you got to plan how you are going to get rid of it." Removal is most commonly done by "resecting" the tumor, a procedure performed while the patient is under general anesthesia wherein a resectoscope, a C-shaped electrical wire, is inserted through the urethra, and is used to "lift up the surface of the bladder and remove the tumor." Dr. Foster testified that it is important to remove the tumor as well as some healthy tissue beneath the tumor for a biopsy, "because the pathologist needs to see what the grade is and what the stage is and whether its invasive." Specifically, he stated, "you want to get some lining of the bladder around the cancer" and that, particularly in patients who have had multiple recurrences, it is important to get some muscle tissue for the biopsy to "prove that it's not penetrated . . . deeper than you think it has." He explained that if cancer "gets into the muscle, it's a much more dangerous problem, because if it gets to the muscle, it tends to be more aggressive and it grows faster and it can get outside the lining of the bladder – outside the bladder and be a very lethal cancer."

Dr. Foster specifically testified that Dr. Goryl did not cystoscope Mr. Griffith's bladder between August 2005 and February 2006, a period of more than six months and a critical time period in Mr. Griffith's case. Dr. Foster testified that the standard of care

---

[3](...continued)
35 specialties. . . . Cookeville Regional Medical Center . . . [is] accredited by the Joint Commission on Accreditation of Healthcare Organizations. Cookeville Regional Medical Center received the Distinguished Hospital Award for Overall Clinic Excellence, placing Cookeville Regional Medical Center in the top 5% of hospitals nationwide from Health Grades in 2007."

[4]A cystoscopy is a procedure that can be done in the doctor's office, in which a flexible "cystoscope" is inserted into the patient's urethra, which allows the doctor to observe the condition of the bladder and determine whether there are any new tumors.

required Dr. Goryl to perform a cystoscopy at least one more time in 2005, particularly given the fact that Mr. Griffith had several recurrences prior to August 2005 as well as several rounds of Mytomycin and BCG (Bacillus Calmette-Guerin), which are both forms of chemotherapy applied directly to the bladder after a resection to kill off any loose cancer cells to help prevent recurrences.

Dr. Foster testified that, according to Dr. Goryl's notes, during the February 2006 cystoscope, Dr. Goryl observed several "necrotic tumors," or tumors that have some dead tissue, on Mr. Griffith's bladder. Dr. Foster explained that the presence of necrotic tissue on a tumor indicates that the tumor is "outgrowing its blood supply," and that such a tumor "tends to be more aggressive." In March 2006, Dr. Goryl checked Mr. Griffith into the Cookeville Regional Hospital to resect the tumor, and apply another treatment of Mytomycin. However, during the cystoscope, Dr. Goryl could no longer locate the non-necrotic tumor. He cauterized the necrotic tumors, but did not perform a resection or remove any other tissue for a biopsy. Dr. Foster testified that Dr. Goryl did not spend enough time thoroughly examining the bladder, specifically:

Q. Was it a breach of – are there any breaches of the standard of care in your opinion with regard to this procedure?

A. I think so. I mean, the rule is remove – remove visible tumor. It's not easy to do it in the dome of the bladder. It takes a lot of effort. The bladder – a normal bladder is very thin, if there's necrotic tumor there, it's more likely to be thickened, you could have found that out a little bit from what you see as well as scans or ultrasounds or whatever that weren't done.

But you know, if you're uncomfortable resecting this, you at least need to prove what it is. I mean, you can use a pinch forceps biopsy where you can just take pieces of it, particularly at the edge where the dead looking tissue connects to the normal looking tissue. You need to get as far in there as you can. This is – this is by experience more likely to be high grade tumor, it's more likely to be – more likely than not – particularly knowing what this patient . . . this particular patient, that this is now the fifth recurrence and it is necrotic and it's been six months since the last time it was even looked at, you know, this is a dangerous tumor. And it needs to be proven whether it is. Now, if you resect it and it's not in the muscle and it's just necrotic tissue that would not be appropriately seen there, that's – you have to prove it. You cannot assume it. It is wrong to just think that Mitomycin he had a number of months ago caused this necrosis.

Three months later, Mr. Griffith began "voiding," or urinating, pure blood. Dr. Goryl checked him back into the hospital to observe the bladder while Mr. Griffith was under anaesthesia. Dr. Goryl observed bleeding in the dome of Mr. Griffith's bladder, the area where Mr. Griffith had repeated recurrences. He did remove some tissue for a biopsy, but Dr. Foster reviewed the pathology report, and testified that the tissue removal was not "deep enough . . . to even see cancer," and that "knowing what you know about this patient, this pathology report doesn't tell you anything."

Dr. Goryl examined Mr. Griffith once more, in September 2006, before referring him to Vanderbilt Medical Center. Dr. Goryl's notes from that procedure state that Mr. Griffith's bladder looked "red and angry" and there were large areas "sloughing of tissue" but the notes contain no mention of cancer. In October 2006, Dr. Cookson at Vanderbilt performed another cystoscopy on Mr. Griffith as well as a CAT scan, which revealed a 4.9 by 3.9 centimeter mass projecting from the dome of the bladder, and which also revealed that cancer had spread to multiple lymph nodes. Dr. Cookson diagnosed the cancer as Stage 4, which is not curable.

Dr. Foster concluded that Dr. Goryl breached the standard of care by not ruling out the possibility that Mr. Griffith's repeated recurrences, in the same location, were in fact due to an aggressive and dangerous cancer. He testified that there were several ways Dr. Goryl could have done this and complied with the standard of care, such as by cystoscoping Mr. Griffith more frequently, taking deeper biopsies, performing imaging studies such as a CAT scan, or performing other types of studies to determine the cause of the blood in the urine and the other severe symptoms Mr. Griffith was experiencing, but that Dr. Goryl did none of these things, and as a result, Mr. Griffith's cancer steadily progressed until it was no longer treatable and eventually caused his death.

During cross examination, Defendant questioned Dr. Foster regarding his opinions on the standard of care and whether it had been breached by Dr. Goryl. In particular, Dr. Goryl was asked his opinion on the requirement for CT scans or other types of "imaging studies":

Q. Did you ever say Dr. Goryl breached the standard of care for failing to get imaging studies in any of your reports or depositions, yes or no?

A. Based on that question, but that's – I mean, no, but let me qualify that please. The standard of care is what the majority of well-trained physicians, urologists in a case like this would do, and I mentioned here that – in my deposition that these would include imaging studies. You got to know what you are dealing with.

Q. But you agree you never said he was medically negligent for failing to get imaging studies, the answer to that question is no.

A. I didn't use those words specifically.

Plaintiff called several other witnesses to testify; however, Dr. Foster provided the only expert medical proof. Dr. Goryl's deposition was not introduced into evidence and he was not called as an expert witness. At the close of Plaintiff's proof, Defendant moved the court for peremptory instructions and a directed verdict pursuant to Rule 50 of the Tennessee Rules of Civil Procedure. Defendant argued Dr. Foster was not competent to opine as to the applicable standard of care and whether Dr. Goryl breached that standard in diagnosing and treating Mr. Griffith. Moreover, because expert testimony is required to establish the elements of a medical malpractice claim pursuant to Tennessee Code Annotated § 29-26-115 and Dr. Foster was Plaintiff's only proffered medical expert, Plaintiff failed to provide sufficient proof to establish a prima facie case of medical malpractice.

The trial court granted Defendant's motion on November 17, 2011. In the final order, the trial court held:

> Dr. James Gilbert Foster defined the standard of care as what a 'majority of physicians' would do with respect to the treatment of the plaintiff. This Court is of the opinion that the Tennessee Appellate Courts have rejected this as competent proof with respect to the standard of care, and accordingly, the opinions of Dr. James Gilbert Foster do not constitute competent medical evidence with respect to a deviation of the standard of care in Tennessee for board certified urological surgeons practicing in Cookeville, Putnam County, Tennessee or similar communities during the time frame Dr. Goryl treated [P]laintiff's decedent, Bob Griffith.
> . . . .
>
> Accordingly, the Court finds that James Gilbert Foster, M.D., being the plaintiff's only proffered expert on this issue, that the plaintiff's proof is devoid of competent proof with respect to the standard of care.
>
> It is, therefore, ORDERED, ADJUDGED AND DECREED that the defendant's motion for a directed verdict is granted.

Plaintiff filed a timely appeal and asserts on appeal that the trial court erred in excluding Dr. Gilbert's testimony and granting Defendant's motion for a directed verdict.

ANALYSIS

Although the legal nuances at issue are anything but simple, the dispositive factor, or phrase, at issue here is whether the inclusion of three words – "the majority of" – in response to one question that pertained to the failure of Dr. Goryl to get imaging studies renders all of Dr. Foster's testimony inadmissible.[5] We have determined, when the totality of Dr. Foster's testimony concerning his knowledge of the standard of care is considered, the mere inclusion of the phrase "the majority of" in response to one question does not disqualify him from testifying as a medical expert concerning the standard of care at issue in this case.

**I.**

Tennessee Code Annotated § 29-26-115 provides the essential elements of a medical malpractice claim[6] in subsection (a), and sets forth the requirements for competency of a proffered medical expert in subsection (b):

> (a) In a medical malpractice action, the claimant shall have the burden of proving by evidence as provided in subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or

---

[5]Q. Did you ever say Dr. Goryl breached the standard of care for failing to get imaging studies in any of your reports or depositions, yes or no?

A. Based on that question, but that's – I mean, no, but let me qualify that please. The standard of care is what *the majority of* well-trained physicians, urologists in a case like this would do, and I mentioned here that – in my deposition that these would include imaging studies. You got to know what you are dealing with.

[6]The 2012 version of the statute refers to "health care liability actions." Because this action was commenced in 2007, we will use the term, "medical malpractice," as provided under the version of the statute in effect at that time.

omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Part (1)(a), known as the "locality rule," requires the plaintiff to "show that the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region," namely, "'the community in which [the defendant] practices or in a similar community.'" *Sutphin v. Platt*, 720 S.W.2d 455, 457 (Tenn. 1986) (quoting Tenn. Code Ann. § 29-26-115(a)(1)).

In *Shipley v. Williams*, 350 S.W.3d 527 (Tenn. 2011), the Tennessee Supreme Court discusses in detail the relationship between the two subsections of this statute and how courts should handle challenges to the competency of a plaintiff's proffered expert witness. The court stated:

Subsection (a) and (b) serve two distinct purposes. Subsection (a) provides the elements that must be proven in a medical negligence action and subsection (b) prescribes who is competent to testify to satisfy the requirements of subsection (a).

Any challenge to the admissibility of testimony from a medical expert who is competent to testify under section 29-26-115(b) can be made based on the Tennessee Rules of Evidence. In particular, Tennessee Rules of Evidence 702 and 703 are called into play. . . . A trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703.

In its role as a gatekeeper, the trial court is to determine (1) whether the witness meets the competency requirements of Tennessee Code Annotated § 29-26-115(b) and, (2) whether the witness's testimony meets the admissibility requirements of Rules 702 and 703. The trial court is not to decide how much weight is to be given to the witness's testimony. Once the minimum requirements are met, any questions the trial court may have about the *extent*

of the witness's knowledge, skill, experience, training or education pertain only to the weight of the testimony, not to its admissibility.

*Shipley*, 350 S.W.3d at 550-51 (other internal citations omitted) (emphasis in original).

As further discussed at length in *Shipley*, a frequently litigated issue in medical malpractice claims is whether a medical expert who is qualified under subsection (b) can overcome the evidentiary hurdles in Rules 702 and 703. *See id.* at 538. The *Shipley* Court took great pains to clarify the evidentiary standards:

> Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.

*Id.* at 552.[7]

This court reviews a trial court's decision regarding expert witness competency and qualifications under an abuse of discretion standard. *Taylor ex rel. Gneiwek v. Jackson-Madison Cnty Gen. Hosp. Dist.*, 231 S.W.3d 361, 371 (Tenn. Ct. App. 2006); *see also Shipley*, 350 S.W.3d at 552 ("Tennessee continues to follow the majority rule and apply the abuse of discretion standard to decisions regarding the admissibility of evidence."). A trial court abuses its discretion "when it disqualifies a witness who meets the competency requirements of section 29-26-115(b) and excludes testimony that meets the requirements of Rule 702 and 703." *Shipley*, 350 S.W.3d at 552.

---

[7]We recognize the *Shipley* decision focuses on how an expert can comply with the geographic requirements of the locality rule. We also find the opinion explains, as Justice Holder writes in her concurrence, the "interplay" between the elements a plaintiff must prove to recover damages in a medical malpractice case, the requirements for competency of expert witnesses, and the Tennessee Rules of Evidence regarding expert testimony. *Shipley*, 350 S.W.3d at 557 (Holder, J., concurring).

## II.

Turning to the case at bar, it is undisputed that Dr. Foster meets the requirements for competency set forth in Tennessee Code Annotated § 29-26-115(b), in that he was licensed and certified in the same specialty as Dr. Goryl, and practicing in Atlanta, Georgia from 2004 to 2006. Dr. Foster's expertise in the field of urology is also unquestioned. He earned his medical degree at Emory University School of Medicine in 1973. He was a general surgery resident at Vanderbilt University affiliated hospitals from 1973-1975 in preparation for his urology specialization, which he completed at Emory University in 1978. He testified that he had been an actively practicing, board-certified urologist since 1980. He is the member of several national and regional medical associations, and has been on the clinical teaching staff of Emory University for over fifteen years. He testified that he has treated between three and four hundred bladder cancer patients during his career.

Moreover, Dr. Foster specifically testified that he was familiar with the standard of care in Cookeville, Tennessee, during the time period between 2004 and 2006. Thus, to resolve the question of whether the jury should have been permitted to consider Dr. Foster's testimony, we must determine whether "the facts or data" underlying Dr. Foster's testimony "indicate [a] lack of trustworthiness." Tenn. R. Evid. 703; *see also Shipley*, 350 S.W.3d at 551.

In his affidavit dated November 16, 2011, Dr. Foster stated:

> "Cookeville Regional Hospital is a 247-bed regional referral center in the heart of the Upper Cumberland in middle Tennessee. It has over 120 physicians providing care in 35 specialties. . . . Cookeville Regional Medical Center . . . [is] accredited by the Joint Commission on Accreditation of Healthcare Organizations. Cookeville Regional Medical Center received the Distinguished Hospital Award for Overall Clinic Excellence, placing Cookeville Regional Medical Center in the top 5% of hospitals nationwide from Health Grades in 2007."

During an April 9, 2010 deposition, Dr. Foster testified that he had reviewed a document providing statistical information about Cookeville, Tennessee, and Putnam County, including information about its population, labor force, and employment and unemployment rates. During Defendant's voir dire of Dr. Foster at the November 14, 2011 hearing, Dr. Foster testified to the following:

> Q. What have you looked at to familiarize yourself with Cookeville, Tennessee?

A. Well, you know, it's a community of, . . . at that time of about 26, 27,000 people. It has about a 250-bed hospital that's accredited by the Commission on Cancer, the American College of Surgeons. . . . That hospital meets certain standards to treat cancer. They have – they have all the facilities, they have all of the resources in terms of numbers of various specialties.

Dr. Foster also testified that, due to his residency at Vanderbilt University, he knew "a good bit" about Tennessee, and had trained several doctors who went on to practice in Tennessee.

During his direct examination, Dr. Foster further testified:

Q. And what have you looked at about Cookeville, Tennessee?

A. Well, I certainly looked at . . . the hospital's information, available information. They have an approved cancer program and they are an approved . . . cancer center. . . . They've gotten commendations, they do a great job. But it means that they've got the services, they have the – imaging studies, they have the facilities to treat cancer and monitor the – the outcome of cancer. Much data is produced, they have a cancer committee . . . that monitors the cancer activity in the hospital, so it's a reporting about the stage and grade of the cancers they see, somewhat the outcome of their cancers, they have all the specialties needed. They have medical oncology, radiation oncology, surgical oncology for various surgical procedures that are for cancer treatment.

And at Cookeville, Tennessee, at this hospital, I was looking at the data because the data is available to everybody. . . . [A]bout three to five percent of the cancers treated in that hospital are bladder cancers. . . .

Q. Have you – did you look at any of the data available about Cookeville, Tennessee?

A. I did. Cookeville, Tennessee, in that time frame was a bit over 25,000 people in the city. The county has 60 or 70,000 but in the Upper Cumberland region, today it's over a hundred thousand population.

Dr. Foster also explained that the hospital he was affiliated with in Georgia had the same type of "cancer committee," and that he had previously served on that committee for years. He went on to state that he read Dr. Goryl's deposition for this case, and that he had reviewed information about Dr. Goryl's practice by viewing UCUA's website and learned

that, "they have board certified urologists, I think three there. They have a pretty specialized nurse who's got a master's and does various specialties and I think she actually got her master's at Emory."

Furthermore, Dr. Foster testified that he had reviewed Mr. Griffith's medical records, and was familiar with the types of instruments, medicines, and procedures Dr. Goryl used in treating Mr. Griffith. He had also reviewed the information in Dr. Goryl's records about Dr. Spivey's treatment of Mr. Griffith, as well as Mr. Griffith's medical records from Vanderbilt.

Although Dr. Foster testified at length concerning the facts and data upon which he identified the standard of care Dr. Goryl should have employed in his care of the decedent, the trial court concluded that his testimony was wholly negated by Dr. Foster's use of the phrase "majority of well-trained physicians, urologists" in response to one question:

> Q. Did you ever say Dr. Goryl breached the standard of care for failing to get imaging studies in any of your reports or depositions, yes or no?

> A. Based on that question, but that's – I mean, no, but let me qualify that please. The standard of care is what the majority of well-trained physicians, urologists in a case like this would do, and I mentioned here that – in my deposition that these would include imaging studies. You got to know what you are dealing with.

Certainly, as the trial court provided in its final order, our courts have rejected the idea that "what a majority of physicians would do" in a given case is equivalent to the standard of care. For example, in *Hopper v. Tabor*, No. 03A01-9801-CV-00049, 1998 WL 498211, at *1 (Tenn. Ct. App. Aug. 19, 1998), this Court affirmed the trial court's decision to exclude the plaintiff's proffered medical expert from testifying where the proffered expert testified that he "can't be precise about" the applicable standard of care, but that, "to me, standard of care means doing those things which a majority of physicians in a community would consider to be reasonable medical care in that community." *Id.* at *3. The doctor in *Hopper* went on to testify:

> I know there are . . . oncologists in Johnson City. I believe some or all are Board qualified or Board certified, and in general, the standard of care in most metropolitan areas across the United States would be relatively similar if Board Qualified or Board Certified physicians are involved, *but I'm not specifically aware of the standard in Johnson City precisely*.

*Id.* (emphasis added). The *Hopper* court found that, "what 'a majority of physicians in a

community would consider to be reasonable medical care in that community' is not the meaning of standard of care," and that, "[i]f this were the case, it would require a poll of physicians in a community to determine the standard of care." *Id.* The court concluded that the proffered expert's deposition testimony "does not satisfy the statutory requisite that the deponent be familiar with the standard of care in Johnson City, Tennessee, or similar communities." *Id.* We are in agreement with that determination but find it distinguishable from the facts of this case.

In *Land v. Barnes*, No. M2008-00191-COA-R3-CV, 2008 WL 4254155, at *5-6 (Tenn. Ct. App. Sept. 10, 2008), we affirmed the trial court's decision to exclude the opinion testimony of the plaintiff's proffered expert, a doctor practicing in Murray County, Georgia, regarding the standard of care for a nurse practitioner in Lincoln County, Tennessee. The court found that the plaintiff established Murray County, Georgia and Lincoln County, Tennessee, were "similar communities," under the locality rule, but that the expert was not qualified under Section -115(b), *because the plaintiff failed to show that the expert's licensure (as a doctor) was relevant to the issues in the case (alleged malpractice by a nurse practitioner)*. Specifically, the court noted that the doctor never testified that she was familiar with the standard of care for nurse practitioners, and furthermore, the "scope of . . . permissible practice" for nurse practitioners differed greatly from Georgia to Tennessee, and the proffered expert repeatedly admitted she was not aware of the scope of practice for nurse practitioners in Tennessee.

After discussing these striking deficiencies, the *Land* court went on to note that the plaintiff's expert could not base her expert opinion on the Tennessee hospital's internal protocol manual, and that "the reliability of her testimony" was further called into question by the following testimony:

Q. Your definition of standard of care . . . was: "The standard of which the majority of practitioners for a given area would use in diagnosis and treatment of various diseases and symptoms." . . . Is that definition your understanding as to what standard of care means, as far as your testimony is concerned in this case?

A. Yes.

Q. Okay. And that's the definition of standard of care that you used to base the opinions you have given regarding the standard of care in this case, right?

A. Yes.

*Id.* at *5-6. Based upon the foregoing, we are also in agreement with that determination but, again, find it distinguishable from the facts of this case.

Finally, in *Godbee v. Dimick*, 213 S.W.3d 865, 895 (Tenn. Ct. App. 2006), the trial court excluded a portion of the plaintiff's proffered expert testimony in which the expert testified, "I am not certain if doing the approach that was taken would fall in the category of being a violation of the standard of care, but it would be a unique approach or a different approach than taken by the majority of people facing this type of clinical problem," and "I believe in my practice and in the practice of most spinal surgeons in Middle Tennessee that if . . . one feels that a good surgery can be performed from one side that the generally accepted approach would be to approach it from the symptomatic side and not from the asymptomatic side." This court affirmed these exclusions on the grounds that "it is settled that the practice of the majority of physicians in a community is not analogous to the standard of care in a community." *Id.* at 896. Once again, we are in agreement with the court's conclusion but find the underlying facts distinguishable.

In each of these cases, the proffered expert *admitted* to not knowing the applicable standard of care, but then testified that he or she nonetheless believed the defendant breached the standard of care by failing to conform to the practices of the majority of doctors or, in *Land*, nurse practitioners. *See Land*, 2008 WL 4254155, at *4 (proffered expert admitted not knowing scope of practice of nurse practitioners in Tennessee); *Godbee*, 213 S.W.3d at 895 ("I am not certain if doing the approach that was taken would fall in the category of being a violation of the standard of care."); *Hopper*, 1998 WL 498211, at *3 ("I'm not specifically aware of the standard of care in Johnson City precisely.").

Dr. Foster, by contrast, repeatedly testified that he was aware of the standard of care for urologists practicing in Cookeville, Tennessee, from 2004-2006. Dr. Foster testified to what "the majority of *well-trained physicians, urologists*, in a case like this would do." (Emphasis added). The use of the phrase, "well-trained physicians, urologists" narrows the field considerably. More importantly, as discussed above, Dr. Foster provided a detailed explanation of the facts he relied upon in forming his opinion as to that standard. Dr. Foster's "somewhat inartful" response to a single question related specifically to imaging studies does not undermine the basis for his testimony or render his expert opinion untrustworthy. *Cf. Wynn v. Hames*, No. W2001-00269-COA-R3-CV, 2002 WL 1000268, at *6 (Tenn. Ct. App. May 13, 2002) (expert testimony, although "somewhat inartful," is not inadmissible where the expert defined the standard of care as "what I and the majority of my ER physicians in this area would do in a specific case," but also testified he was familiar with the standard of care and described his "extensive knowledge throughout the region concerning the practice of emergency room physicians").

We fully recognize that the practice of a majority of physicians in a community is not determinative of the standard of care, for a certain medical practice can be used by a majority of physicians in a certain case and fall below the standard of care, provided there is competent expert testimony to establish such. Likewise, a practice not used by a majority of physicians in a community could meet or exceed the standard of care, again, provided there is competent expert testimony establishing such. We, however, also recognize that, "[a] mere ritualistic incantation of statutory buzz words evidences very little." *Church v. Perales*, 39 S.W.3d 149, 166 (Tenn. Ct. App. 2000). Accordingly, "when an expert's opinion is challenged, we will determine whether the opinion is based on trustworthy facts or data sufficient to provide some basis for the opinion." *Id.* (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). As discussed in *Land*, *Godbee*, and *Hopper*, simply determining the majority practice, without more relevant and trustworthy facts or data, is not a sufficient basis for an expert opinion regarding the standard of care. *See Land*, 2008 WL 4254155, at *4; *Godbee*, 213 S.W.3d at 896; *Hopper*, 1998 WL 498211, at *3. Moreover, as discussed in *Shipley*, "an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area" generally will be a sufficient basis for expert testimony regarding what is required by the standard of care in a given community. 350 S.W.3d at 552; *see also Wynn*, 2002 WL 1000268, at *5.

To once again quote our Supreme Court in *Shipley*, "[a] trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703," and "[o]nce the minimum requirements are met, any questions the trial court may have about the extent of the witness's knowledge, skill, experience, training or education pertain only to the weight of the testimony, not to its admissibility." *Shipley*, 350 S.W.3d at 550-51.

For the foregoing reasons, applying the *Shipley* standard, we have concluded that Dr. Foster was competent to testify as to the standard of care Dr. Goryl should have employed when treating the decedent for bladder cancer and whether Dr. Goryl deviated from the applicable standard of care in his treatment of the decedent.

A trial court abuses its discretion "when it disqualifies a witness who meets the competency requirements of section 29-26-115(b) and excludes testimony that meets the requirements of Rule 702 and 703." *Shipley*, 350 S.W.3d at 552. Accordingly, we reverse the decision of the trial court to exclude the opinion testimony of Dr. Foster.

## II.

When deciding a motion for a directed verdict, both the trial court and the reviewing court on appeal must look to all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences in favor of that party, while discarding all evidence to the contrary. *Conaster v. Clarksville Coco-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Dobson v. Shortt*, 929 S.W.2d 347, 349-50 (Tenn. Ct. App. 1996). The directed verdict cannot be sustained if there is material evidence in the record which would support a verdict for Plaintiff. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995); *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 683 (Tenn. Ct. App. 1994).

We have determined the trial court erred in refusing to consider Dr. Foster's expert testimony regarding the standard of care. If Dr. Foster's expert opinion testimony is taken into account, there is plainly "material evidence in the record which would support a verdict" for Plaintiff. *Hurley*, 922 S.W.2d at 891; *Souter*, 895 S.W.2d at 683. Thus, we find the trial court erred in entering a directed verdict in favor of Defendant.

### IN CONCLUSION

The judgment of the trial court is reversed and this matter is remanded for a new trial. Costs of appeal assessed against the defendant, Dr. Stephen Goryl.

_____
FRANK G. CLEMENT, JR., JUDGE