# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
July 22, 2014 Session

## LEON DICKSON, SR. v. SIDNEY H. KRIGER, M.D.

**Appeal from the Circuit Court for Shelby County**
**No. CT-005591-04     James F. Russell, Judge**

---

**No. W2013-02830-COA-R3-CV - Filed December 30, 2014**

---

Patient brought a health care liability action against his eye surgeon, alleging that the surgeon's negligence in performing a LASIK procedure resulted in several eye injuries. The trial court granted a directed verdict for the surgeon, finding the patient failed to present evidence establishing the standard of care and causation. Because we find the evidence was sufficient to create an issue for the jury, we reverse and remand to the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., and KENNY W. ARMSTRONG, SP. J., joined.

Robert L. Green and Darryl D. Gresham, Memphis, Tennessee, for the appellant, Leon Dickson, Sr.

Karen S. Koplon and Hugh Francis, Memphis, Tennessee, for the appellee, Sidney H. Kriger, M.D.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Leon Dickson, Sr. had experienced poor vision since childhood and decided to inquire about laser corrective eye surgery, also known as LASIK[1] surgery, in 2003. Mr. Dickson hoped LASIK surgery would make his life easier by removing the need for glasses and the irritation from contact lenses. Mr. Dickson's optometrist referred him to Dr. Sidney H.

---

[1] LASIK is an acronym for laser-assisted in-situ keratomileusis.

Kriger, an opthalmologist in Memphis, Tennessee.

On May 9, 2003, Dr. Kriger performed LASIK surgery on both of Mr. Dickson's eyes. After the surgery, Mr. Dickson complained of several problems in his left eye. He later discovered that he suffered from an inferior temporal decentered ablation[2] of his cornea. Mr. Dickson filed a complaint on September 27, 2004, claiming that Dr. Kriger was negligent in performing the LASIK surgery.

After nine years, several pre-trial motions, and an interlocutory appeal, the case proceeded to trial on October 28, 2013. At the conclusion of Mr. Dickson's proof, Dr. Kriger moved for directed verdict. The trial court granted the motion, finding that Mr. Dickson had failed to establish a prima facie case of health care liability. Specifically, the court found that Mr. Dickson had failed to establish: (1) the standard of care for ophthalmologists in Memphis at the time of Mr. Dickson's surgery; and (2) that Dr. Kriger's negligence was the proximate cause of Mr. Dickson's eye injuries.

## A. Proof at Trial

Mr. Dickson testified that he has developed several on-going conditions in his left eye since the LASIK surgery: shooting pain "30 to 40 times a day"; poor vision; extreme sensitivity to light; glare; and difficulty seeing at night. The conditions resulted despite Mr. Dickson apparently doing well during surgery. When asked about whether Mr. Dickson followed instructions during surgery, Dr. Kriger testified as follows:

Q:      And at no time did you ever stop the procedure because Mr. Dickson was not focusing on the red light, correct?

A:      That is true.

Q:      Now, so in essence, as far as Mr. Dickson is concerned in this procedure, he cooperated 100 percent, correct?

A:      That is true.

Dr. Kriger further testified that if he or a monitor in the room had seen Mr. Dickson's eye

---

[2] "A 'decentered ablation' occurs when the eye area reshaped by the laser is not centered to the eye's visual axis. This results in a variety of vision problems, including glares, halos, ghost images, and blurred vision." *Dickson v. Kriger*, 374 S.W.3d 405, 406 n.1 (Tenn. Ct. App. 2012) (decision on parties' interlocutory appeal).

move from the center of the laser beam, he "would . . . have stopped [the laser], [and] the laser would have broken laser lock and it would have stopped automatically."

Dr. Kriger agreed that the creation of the corneal flap is very important, and if a "bad flap" is created, the LASIK procedure should not go forward. He claimed, however, that the flap created on Mr. Dickson's left eye was adequate to complete the LASIK procedure. Dr. Kriger also asserted that liquid from a tear that appeared on Mr. Dickson's eye during surgery may have "prevented the beam from treating the cornea evenly," and caused Mr. Dickson's eye injuries.

Mr. Dickson's expert medical witness was Dr. Rolando Toyos, an ophthalmologist practicing in Memphis, Tennessee. Dr. Toyos began treating Mr. Dickson in March 2004, after Mr. Dickson's LASIK surgery. Dr. Toyos opined on the procedure for creating a corneal flap sufficient to perform LASIK surgery:

> [W]e would use a piece of technology that used a blade to make this flap that we're going to lift. . . . The most important part about the flap is that we can have a full treatment zone and the flap needs to be big enough so that we can treat all around the pupil. . . .
>
> . . . .
>
> [T]his [microkeratome] would pass with a blade and then go forward – go forward, pass, make the flap and then go back, and then you would take this thing out. . . . [W]e never knew what the flap was going to look like until after the treatment was done. . . . So you would take this microkeratome off and then you would see if you made a perfect flap or a nice flap or a good enough flap to cover the treatment zone.
>
> . . . .
>
> [O]ne of the complications that you talk to patients about is if your flap is not covering the whole treatment zone and is not a regular flap, well we can't do the laser. So all we have to do is, we'll put the flap back down, let it heal and then we'll come back another day.
>
> . . . .
>
> [Y]ou could do a laser with an irregular flap, but the patient's vision is not going to be very good.

Dr. Toyos also testified that he was familiar with the standard of care for ophthalmologists in Memphis:

Q: Based upon what you saw in Mr. Dickson's eye when you examined him, should this flap have been laid down – laid back down?

A: I would have put this flap back down and come back another day, and he would not have had these problems.

. . . .

Q: Dr. Toyos, are you familiar with the concept of the standard of care as required of physicians practicing in this community?

A: Yes.

Q: Do you know the standard of care in this community for eye surgeons?

A: Yes.

. . . .

Q: Dr. Toyos, you've testified that you are familiar with the standard of care for eye surgeons here in the Memphis community, and I want to ask you this question: Do you have an opinion as to whether or not it was a deviation from or a violation of the accepted standard of care for Dr. Kriger to go forward with the LASIK procedure and fail to put the flap back down in Mr. Dickson's case in view of your findings of an irregular flap in the left eye?

A: Yes, it was a deviation of the standard of care.

Q: And can you state that opinion with a reasonable degree of medical certainty?

A: Yes.

Dr. Toyos also read from an October 2005 letter he wrote to Mr. Dickson's attorney regarding the standard of care for LASIK surgeries and the cause of Mr. Dickson's injuries:

-4-

Mr. Dickson was examined many times in our clinic starting on March 26, 2004. He underwent LASIK procedure on both eyes on May 9th, 2003 by Dr. – by Sidney H. Kriger, M.D. Mr. Dickson was having many post-LASIK complaints in his left eye like decreased vision and light sensitivity.

. . . .

Our clinic examination included Orbscan, LADARWave and slit lamp exam. The exam revealed that Mr. Dickson had an irregular flap with decentered and incomplete ablation. These abnormalities led to irregular astigmatism and posterior steepening of the cornea, which is consistent with corneal ectasia.

Mr. Dickson's problems were a direct result of his LASIK procedure. These problems cannot be corrected with more LASIK or corrective lenses. Attempt of correction with cornea inserts were not successful either. He'll be dealing with these eye problems for the rest of his life and may need a cornea transplant.

I believe that his problems are due to complications of LASIK that Sidney H. Kriger, M.D. deviated from the standard of care when he created an irregular flap and still proceeded with the laser procedure.

. . . .

The standard of care during surgery would have been once the irregular flap was made, Sidney H. Kriger, M.D. should have put the flap back in place and not proceeded with the laser procedure.

The direct examination concluded with Dr. Toyos addressing other suggested causes of Mr. Dickson's decentered ablation. He testified that neither a "malfunction of the laser," Mr. Dickson's "failure to fixate on the red blinking light," or a "tear having appeared on the cornea" could have caused Mr. Dickson's eye injuries.

## B. Directed Verdict

The trial court granted Dr. Kriger's motion for directed verdict on November 1, 2013. The court identified several perceived shortcomings with the plaintiff's proof: (1) Dr. Toyos did "not specifically say the standard of care on May 9, 2003 was such and such"; (2) Dr. Toyos did not establish the standard of care for ophthalmologists in Memphis in 2003

regarding the identification of a "good" flap and a "bad" flap; (3) "Dr. Toyos's testimony may be forever tainted with the notion left by that statement, quote, 'I would have put this flap down,' end quote"; (4) Dr. Toyos testified only as to Mr. Dickson's "problems," and did not identify any particular "injuries"; and (5) Dr. Toyos did not testify that Mr. Dickson's "injuries" would not have otherwise occurred but for the alleged medical negligence.

## II. ANALYSIS

Tennessee Rule of Civil Procedure 50.01 provides that a motion for directed verdict "may be made at the close of the evidence offered by an opposing party or at the close of the case." Tenn. R. Civ. P. 50.01. "A motion for directed verdict requires the trial court to determine whether, as a matter of law, the evidence is sufficient to create an issue for the jury to decide." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999). Directed verdicts are appropriate only when reasonable minds could reach only one conclusion from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). When reviewing a trial court's decision regarding a directed verdict, appellate courts apply the same standard of review as the trial court. *See Sauls v. Evans*, 635 S.W.2d 377, 379 (Tenn. 1982). We do not weigh the evidence or evaluate the credibility of witnesses. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *see Kellon v. Lee*, No. W2011-00195-COA-R3-CV, 2012 WL 1825221, at *4 (Tenn. Ct. App. May 21, 2012). Instead, we "take the strongest legitimate view of the evidence in favor of the non-moving party." *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). We allow all reasonable inferences in favor of the non-moving party and disregard all evidence contrary to their position. *Id.*

To avoid a directed verdict in a health care liability action, the non-moving party must present sufficient evidence on each element to establish a prima facie case under Tennessee Code Annotated section 29-26-115(a) (2012). *See Kellon*, 2012 WL 1825221, at *4. However, the plaintiff does not bear the burden of proving all elements of his claim by a preponderance of the evidence at the directed verdict stage. *Id.* at *5. Instead, the plaintiff survives a motion for directed verdict if there is "*any* material evidence in the record to support a verdict for the plaintiff under any of his . . . alleged theories." *Id.* (emphasis in original) (citing *City of Bartlett v. Sanders*, 832 S.W.2d 546, 549 (Tenn. Ct. App. 1991)).

Tennessee Code Annotated section 29-26-115(a) outlines the plaintiff's burden of proof in a health care liability action. To establish a prima facie case, the plaintiff must prove three essential elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the

time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a). The plaintiff must provide expert testimony in accordance with Tennessee Code Annotated section 29-26-115(b) to establish the three necessary elements of a health care liability action. *See Shipley v. Williams*, 350 S.W.3d 527, 537 (Tenn. 2011) (discussing the use of expert testimony under the predecessor medical malpractice statute). To be competent to testify, an expert witness must:

[be] licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Tenn. Code Ann. § 29-26-115(b).

Although in this case an expert witness was required to establish a prima facie case, "[i]t is unreasonable to expect a medical expert to testify with legal precision." *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 905 (Tenn. Ct. App. 2001). Of course, the medical expert's testimony must be admissible and cannot be mere speculation. *See Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861-62 (Tenn. 1985). But, when construing the contents of the witness's testimony, we must view the testimony "as the testimony of a medical person and not that of an individual trained in the law." *Miller*, 73 S.W.3d at 905. However, "[i]t is well settled that the testimony of a physician as to what he would do or his opinion of what should have been done does not prove the standard of care." *Jennings v. Case*, 10 S.W.3d 625, 632 (Tenn. Ct. App. 1999).

## A. Standard of Care

In this case, we must determine whether an expert's testimony regarding the standard of care is sufficient under Tennessee Code Annotated section 29-26-115(a)(1). We conclude that it is. We have never required perfect language from medical experts in healthcare liability actions in order for the case to proceed to the jury. Imprecise statements by an expert witness will not prevent the plaintiff from establishing a prima facie case if a reasonable juror

could conclude that the expert had established the standard of care at the time of the incident giving rise to the plaintiff's injuries. *See Griffith v. Goryl*, 403 S.W.3d 198, 210 (Tenn. Ct. App. 2012).

In *Wynn v. Hames*, No. W2001-00269-COA-R3-CV, 2002 WL 1000268 (Tenn. Ct. App. May 13, 2002), the expert testified that he thought "the standard of care in a certain area would be what I and the majority of my ER physicians in this area would do in a specific case." *Id.* at *6. This Court concluded that, although "somewhat inartful, [the testimony] could be interpreted to be what a reasonable medical practitioner in a same or similar community would have done in a particular case," and thus, could establish the requisite standard of care. *Id.*

Mr. Dickson argues that he established the recognized standard of care for ophthalmologists in Memphis through Dr. Toyos's expert testimony. Dr. Kriger complains that Dr. Toyos did not state that he was familiar with the standard of care for the time period when Mr. Dickson's surgery occurred. Instead, Dr. Toyos testified as to the standard of care "during surgery" and "in Mr. Dickson's case."

Here, Dr. Toyos's testimony was sufficient to establish the applicable standard of care under Tennessee Code Annotated section 29-26-115(a). Dr. Toyos testified that he was familiar with the standard of care in Memphis for eye surgeons and described the appropriate standard of care during Mr. Dickson's LASIK procedure by discussing the technology used to cut a flap, assessment of the flap, and treatment of an irregular flap. Dr. Toyos's use of the phrases "during surgery" or "in Mr. Dickson's case," although less than ideal, would not prevent a jury from determining the time period involved. In response to the question, "Do you have an opinion as to whether or not it was a deviation from or a violation of the accepted standard of care for Dr. Kriger to go forward with the LASIK procedure and fail to put the flap back down in Mr. Dickson's case in view of your findings of an irregular flap in the left eye?," Dr. Toyos responded "Yes, it was a deviation of the standard of care." This testimony can refer to no other standard of care than that applicable on May 9, 2003, the date of Mr. Dickson's surgery. The testimony at trial repeatedly established that Dr. Kriger performed only one surgery on Mr. Dickson, which took place on May 9, 2003.

"The standard of care is determined by whether a physician exercises the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession." *Hopper v. Tabor*, No. 03A01-9801-CV-00049, 1998 WL 498211, at *3 (Tenn. Ct. App. Aug. 19, 1998). Dr. Kriger argues that because Dr. Toyos stated that "[he] would have put the flap back down," Mr. Dickson failed to establish a prima facie case. The trial court also identified this statement as a flaw in the plaintiff's case. Although Dr. Toyos's statement regarding what he would have done is not admissible to establish the standard of

care, it does not negate his later admissible statements regarding the standard of care. When reviewing a motion for directed verdict, we ignore all evidence weighing against the non-moving party. *Eaton*, 891 S.W.2d at 590. Accordingly, we disregard Dr. Toyos's statement regarding what he would do during LASIK surgery and conclude that there was material evidence of the standard of care for ophthalmologists in Memphis on May 9, 2003.

### B. Causation

The final element of a plaintiff's prima facie health care liability action is causation. Tenn. Code Ann. § 29-26-115(a)(3). The plaintiff must prove that: "[a]s a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." *Id.* A mere possibility of causation is not enough to satisfy this burden. *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 649 (Tenn. Ct. App. 1992). Instead, the "plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Lindsey*, 689 S.W.2d at 861; *see also Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993).

When construing the contents of the witness's testimony, and whether it establishes a prima facie showing of causation, we must view the testimony "as the testimony of a medical person and not that of an individual trained in the law." *Miller*, 73 S.W.3d at 905. To require medical expert witnesses to use precise legal language when discussing causation is "expecting too much." *Id.*; *Mitchell v. Ensor*, No. W2001-01683-COA-R3-CV, 2002 WL 31730908, at *11 (Tenn. Ct. App. Nov. 18, 2002). If there are two interpretations of an expert's testimony on causation, the court should adopt the interpretation most favorable to the non-moving party. *See Miller*, 73 S.W.3d at 906. In *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897 (Tenn. Ct. App. 2002), the expert witness in a personal injury action stated, "I don't know what caused the disc herniation." *Id.* at 905-06. The Court concluded that two interpretations of that testimony were possible: (1) the expert did not know what caused the plaintiff's current back condition; or (2) the expert did not know what caused the disc herniation to first appear. *Id.* at 906. The Court adopted the latter interpretation when reviewing a grant of directed verdict because it was most favorable to the non-moving party. *Id.*

In this case, causation must be demonstrated by an expert witness who holds an opinion as to the cause-in-fact to a reasonable degree of medical certainty. *See Kilpatrick*, 868 S.W.2d at 602. However, whether Dr. Toyos's opinion on the cause of Mr. Dickson's eye injuries was held to a "reasonable degree of medical certainty" is a threshold question of admissibility for the trial court to decide. *Bara v. Clarksville Mem. Health Sys., Inc.*, 104 S.W.3d 1, 8 (Tenn. Ct. App. 2002); *Miller*, 73 S.W.3d at 909. The appellees have not raised

the admissibility of Dr. Toyos's testimony as an issue on appeal. *See Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) (noting that an issue is waived if not designated as an issue on appeal). Therefore, the only question before this Court is whether a reasonable juror could conclude that there was material evidence in the record sufficient to prove the causation element. *See Lindsey*, 689 S.W.2d at 861. We conclude that there was such evidence.

Mr. Dickson argues that Dr. Toyos's expert testimony established that Dr. Kriger's decision to proceed with the LASIK surgery after creating an irregular flap caused a "decentered and incomplete ablation" in Mr. Dickson's left eye, which resulted in Mr. Dickson's symptoms of pain, poor vision, sensitivity to light, glare, and difficulty seeing at night. Mr. Dickson further claims the causation element is satisfied because Dr. Toyos testified that if Dr. Kriger had put the flap back down, Mr. Dickson's eye injuries would not have resulted. Dr. Kriger, however, argues that there was no expert testimony establishing to a reasonable degree of medical certainty that Mr. Dickson's injuries proximately resulted from Dr. Kriger's deviation from the standard of care.

Here, Dr. Toyos stated, "Mr. Dickson's problems were a direct result of his LASIK procedure. . . . I believe his problems are due to complications of LASIK that Sidney H. Kriger, M.D. deviated from the standard of care when he created an irregular flap and still proceeded with the laser procedure." As in *Miller*, Dr. Toyos's testimony may be interpreted in two ways: (1) Mr. Dickson developed eye injuries as a result of the LASIK procedure itself; or (2) Mr. Dickson developed eye injuries because of Dr. Kriger's negligence in proceeding with the surgery after creating an irregular flap. A reasonable juror could reach either interpretation of Dr. Toyos's testimony. We must adopt the interpretation most favorable to Mr. Dickson, which is that Dr. Kriger's negligence proximately caused Mr. Dickson's eye injuries. Dr. Toyos did not testify that Dr. Kriger's negligence "probably," or "most likely" caused Mr. Dickson's eye injuries. However, the most favorable interpretation of Dr. Toyos's testimony is that he concluded Mr. Dickson's eye injuries were a direct result of Dr. Kriger's negligence, so his testimony was unqualified by estimates of probability. "Weak or strong, [Dr. Toyos's] testimony at least created a jury question on causation" under Tennessee Code Annotated section 29-26-115(a)(3). *Richardson v. Miller*, 44 S.W.3d 1, 31 (Tenn. Ct. App. 2000).

### III. CONCLUSION

For the reasons set forth above, we reverse the directed verdict and remand the case for further proceedings consistent with this opinion. Costs of this appeal shall be taxed to the Appellee, Dr. Sidney H. Kriger, for which execution may issue if necessary.

_____

W. NEAL McBRAYER, JUDGE