IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2014 Session

## BRITTANY EVANS, By and Through Her Attorney-in-Fact, MARY EVANS, Her Natural Mother v. JENNIFER WILLIAMS, ET AL.

**Direct Appeal from the Circuit Court for Gibson County**
**No. 7717      R. Lee Moore, Jr., Judge**

_____

**No. W2013-02051-COA-R3-CV - Filed June 30, 2014**

_____

This is a health care liability action appeal.[1]  The case was tried before a jury, resulting in a judgment for the defendant physicians.  The trial court excluded the testimony of one of the plaintiff's expert witnesses on the applicable standard of care after finding that he was not qualified under the locality rule.  The plaintiff appealed to this Court arguing, among other things, that the trial court erred in its application of the locality rule.  We hold that it was error for the trial court to exclude the witness, but find that any error was harmless under the facts of this case.  We therefore affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Euel W. Kinsey, Detroit, Michigan, for the appellant, Mary Evans.

Dixie W. Cooper and Chris Tardio, Nashville, Tennessee, for the appellees, Jennifer Williams and James L. Williams, II

### OPINION

#### I. BACKGROUND

On August 5, 1991, Mary Evans ("Mother") gave birth to Plaintiff/Appellant Brittany

_____

[1]The 2012 amendment to § 29-26-115 substituted "health care liability action" for "malpractice action."

Evans ("child") at Gibson General Hospital ("Gibson General") in Gibson County, Tennessee. On that date, Mother and the child were attended to by two family practice physicians at Gibson General–a father and son named Dr. James L. Williams ("Dr. L. Williams") and Dr. James L. Williams II ("Dr. J. Williams"). Complications arose during the delivery, and the child was deprived of oxygen for a period of time. The plaintiff later filed this suit alleging that the child suffered permanent mental and physical handicaps as a result of negligent acts and/or omissions by Dr. J. Williams and Dr. L. Williams during the prenatal care and labor, as well as during the child's delivery and resuscitation.

Beginning in November 1990, Mother met with Dr. J. Williams for regularly scheduled checkups throughout her pregnancy. When Mother arrived for a checkup on August 5, 1991, she was in her 42nd week of pregnancy according to a first trimester ultrasound. Dr. J. Williams testified that on that date, because of the length of the pregnancy at that point, he was prepared to talk to Mother about inducing labor. Fortunately, when Mother arrived at the hospital that morning, she was beginning to show signs of early labor. After determining that the amniotic sac was still in place and the baby was moving normally, Dr. J. Williams sent Mother to walk around near the hospital to help accelerate the labor.

Mother arrived back at the hospital around 2:45 p.m., and her labor progressed rapidly from that point. At 3:50 p.m. Dr. J. Williams artificially ruptured the amniotic sac and noted the presence of meconium in the amniotic fluid. Realizing the potential risk of asphyxiation posed by the meconium, Dr. J. Williams called Dr. L. Williams, to assist him in resuscitating the child after delivery. Dr. L. Williams arrived at the hospital around 4:20 p.m.

At 5:02 p.m., the child was delivered via mid forceps, weighing seven pounds, eight ounces. The umbilical cord and placenta were meconium stained, which Dr. L. Williams stated in deposition indicated meconium entered the amniotic sac prior to labor. Upon delivery, the child was unresponsive and her skin color was blue. Dr. J. Williams immediately handed the child over to Dr. L. Williams for resuscitation while he continued to tend to Mother. The child was subsequently transported to Jackson-Madison County General Hospital where chest x-rays confirmed meconium aspiration. The following morning, she was transferred to the Newborn Intensive Care Unit at The Med in Memphis, where she would remain for a week. At The Med, she was diagnosed as having experienced perinatal asphyxia with hypoxic-ischemic encephalopathy, or brain damage due to lack of blood flow.

On June 23, 2000, the child, through Mother, filed her original complaint in this case against Dr. J. Williams, Dr. L. Williams, their employer Med-South Healthcare of Trenton, and Gibson General (collectively "defendants") alleging medical malpractice and seeking damages for her injuries during the birth process. The complaint alleged that Dr. J. Williams

and Dr. L. Williams each deviated from the acceptable standard of professional care by failing to timely deliver the child and failing to properly diagnose and treat fetal distress. Additionally, the complaint alleged that Dr. L. Williams failed to properly resuscitate and stabilize the child immediately following delivery.

The defendants answered, denying the allegations of negligence, and a prolonged period of discovery ensued. In early 2004, Dr. L. Williams passed away and Jennifer Williams, the administrator of his estate, was added as a defendant. Proceedings in the case were stayed from April 2004 to February 2006 pending the Tennessee Supreme Court's decision in *Calaway v. Schucker*, 193 S.W.3d 509 (Tenn. 2005), which dealt with the statute of limitations in medical malpractice cases where the plaintiff is a minor. Another period of prolonged discovery followed the resumption of proceedings in 2006. In January 2011, the plaintiff reached a settlement agreement with Gibson General and dismissed its claims against the hospital.

After over a decade of litigation, opening arguments in the trial took place on January 22, 2013 before a jury in Gibson County Circuit Court. On the third day of trial, plaintiff's counsel called Dr. Alan Gorrell, an OB/GYN from Bristol, Tennessee to testify regarding the applicable standard of care in this case.[2] Dr. Gorrell's direct examination began with questioning intended to establish his qualifications to testify on the standard of care. Dr. Gorrell stated that he had been delivering babies since 1972 and had been practicing medicine in Tennessee since 1980. To demonstrate his familiarity with the standard of care governing the defendants in this case, Dr. Gorrell testified regarding his knowledge of Gibson County and its medical facilities. Dr. Gorrell stated that Gibson County had a population of approximately 55,000 to 58,000 and one hospital with 55-58 beds. Dr. Gorrell stated that in 1991, Gibson General had two family practice physicians delivering babies and doing obstetric care and one general surgeon who could be called in to perform cesarian sections. Additionally, Dr. Gorrell testified regarding his familiarity with other medical communities in Bristol, Tennessee, Abingdon, Virginia, and Lebanon, Virginia. Dr. Gorrell stated that based on his education and experience, he was familiar with the standard of care applicable to a reasonable family practice physician in 1990 and 1991 in Gibson County.

Following the direct examination, the court allowed the defendants' counsel to

_____

[2]At a 2011 hearing, the trial court declined to rule on the defendants' pending motion *in limine* to exclude Dr. Gorrell under the locality rule of Tennessee Code Annotated section 29-26-115, stating that such a ruling would be premature at that time. At the time of the 2011 hearing, *Shipley v. Williams*, 350 S.W.3d 527 (Tenn. 2011), which clarified the requirements of the locality rule, was pending before the Tennessee Supreme Court.

conduct a voir dire examination of Dr. Gorrell. The defendant's voir dire questioning focused primarily on the three communities Dr. Gorrell indicated familiarity with during his direct examination–Bristol, Tennessee, Abingdon, Virginia, and Lebanon, Virginia. When asked directly, Dr. Gorrell conceded that Bristol and Abingdon were not similar medical communities to Gibson County. With regard to Lebanon, Dr. Gorrell testified that he had provided consultation services to two family practice physicians there in the early 1980s, but conceded that he had never actually delivered a baby there. In fact, Dr. Gorrell stated that the only time he ever went to the hospital in Lebanon was to meet the two doctors he was consulting.

After concluding the voir dire examination, Dr. Gorrell and the jury were excused from the courtroom and the defendants' counsel moved the court to exclude Dr. Gorrell's testimony. The defendants' counsel contended that Dr. Gorrell failed to establish familiarity with a community similar to Gibson County in 1990 and 1991 because his role as a consultant to the family practitioners in Lebanon, Virginia ended in the early 1980s. Conversely, the plaintiff's counsel argued that regardless of Dr. Gorrell's familiarity with similar communities, his familiarity with the community size, hospital size, and availability of medical resources in Gibson County was sufficient to make his testimony admissible. After an extended discussion with the attorneys, the court found that Dr. Gorrell was not familiar with the standard of care in Gibson County or a similar community in the early 1990s and granted the defendants' motion to exclude Dr. Gorrell. The trial continued as the jury heard testimony from members of the child's family and was read or shown video of depositions from unavailable witnesses such as Dr. L. Williams.

The following day, the plaintiff presented the testimony of Dr. Sharon Lee, a family practice physician from Missouri. Dr. Lee stated that she had delivered between 3,000 and 5,000 babies over the course of her career, and testified regarding the standard of care in this case. Dr. Lee testified that because of the danger that the placenta will stop delivering nutrients and oxygen to the baby beyond normal gestation, it was a violation of the standard of care to allow the pregnancy to go beyond 42 weeks. Dr. Lee also testified that Dr. J. Williams should have called for the child to be delivered by cesarian section rather than delivering the child by forceps. Dr. Lee stated that the high position of the child's head in a mid forceps delivery makes it difficult to properly apply the forceps, and that misapplication of the forceps can cause injury. Dr. Lee testified that because of the risk of injury associated with mid forceps delivery, it should only be attempted in emergency circumstances where no cesarian section is available. Dr. Lee testified that in her opinion, Dr. J. Williams misapplied the forceps to the child's head. Additionally, Dr. Lee testified that Dr. L. Williams did not meet the applicable standard of care when resuscitating the child after birth.

The jury also heard testimony on the standard of care from another of the plaintiff's witnesses, Dr. Lee Rigg, an OB/GYN from Missouri. Dr. Rigg testified that although 42 weeks gestation is not a hard cutoff, Dr. J. Williams failed to meet the standard of care by failing to perform requisite antenatal testing after 40 weeks and failing to sufficiently monitor the pregnancy in its late stages. Dr. Rigg testified that Dr. J. Williams should have called the staff necessary to deliver the baby by cesarian section by 4:00 p.m. Dr. Rigg testified that in his opinion, because he attempted to apply the forceps while the baby's head remained in a high position, Dr. J. Williams misapplied the forceps to the child's head. Dr. Rigg did not testify regarding the standard of care applicable to Dr. L. Williams's resuscitation of the child.

On the sixth day of trial, the defendants presented the testimony of Dr. Meyer Dworsky, a neonatologist from Huntsville, Alabama. Dr. Dworsky testified that he was familiar with the applicable standard of care in this case because of the time he spent providing care to newborns in Bessemer, Alabama from 1983-1989, which he stated was a similar medical community to Gibson County. The trial court admitted Dr. Dworsky's testimony over the objection of the plaintiff's counsel, who contended that Dr. Dworsky had not displayed familiarity with a similar community. Dr. Dworsky stated that meconium is present in the amniotic fluid of about 10% of newborns. Dr. Dworsky testified that Dr. J. Williams and Dr. L. Williams took the appropriate steps during the child's delivery to suction out the meconium and clear her airway. Dr. Dworsky also testified that Dr. L. Williams's efforts to resuscitate the child after delivery complied with the standard of care. Dr. Dworsky defended Dr. L. Williams's decision not to perform chest compressions on the child, stating that such action would have been unnecessary and could have caused injury.

The defendants also presented the testimony of Dr. Scott Holder, a family practice physician in Winchester, Tennessee, and Dr. Micki Cabaniss, an obstetrician from North Carolina. Dr. Holder and Dr. Cabaniss testified that Dr. J. Williams did not violate the applicable standard of care in delivering the child during the 42nd week of pregnancy. Dr. Holder and Dr. Cabaniss both testified that instructing Mother to walk around to accelerate labor would not have been a violation of the standard of care anywhere. Additionally, Dr. Holder and Dr. Cabaniss testified that given Mother's progression through labor, Dr. J. Williams's decision to deliver the baby with forceps rather than cesarian section met the standard of care. Neither Dr. Holder nor Dr. Cabaniss offered any opinion on resuscitation.

On February 1, 2013, the jury heard closing arguments from each of the parties and the trial court gave the jury its instructions. After several hours of deliberation, the jury returned with a unanimous verdict that the defendants had not violated the applicable standard of care in prenatal care and labor of Mother or in the delivery of the child. In so finding, the jury was not required to address issues of causation and damages. Subsequently,

the plaintiff entered a motion for a new trial, which the trial court denied after a hearing. Additionally, the defendants' filed a motion for discretionary costs, which the trial court also denied. Both parties timely filed notices of appeal to this Court.

The plaintiff raises the following issues on appeal, as slightly restated:

1. Whether the trial court erred in excluding the testimony of Dr. Alan Gorrell pursuant to the locality rule.

2. Whether the trial court erred in admitting the testimony of Dr. Meyer Dworsky pursuant to the locality rule.

3. Whether the trial court erred in admitting testimony regarding a possible genetic clotting disorder.

4. Whether the trial court erred in its jury instructions.

5. Whether the trial court erred in excluding the testimony of economist Dr. John R. Moore.

6. Whether the trial court erred in limiting the testimony of life-care planner Jane Colvin-Robinson.

7. Whether the trial court erred in excluding the testimony of the plaintiff's causation expert, Dr. Eugene Tenorio.

The defendants raise the following issue on appeal:

1. Whether the trial court erred in denying the defendants' request for discretionary costs.

## II. ANALYSIS

### *Expert Witnesses*

We first consider the issues plaintiff raises with regard to the competency of Dr. Gorrell and Dr. Dworsky to testify about the applicable standard of care. The plaintiff contends that Dr. Gorrell displayed a modicum of familiarity with the medical community of Gibson County in 1990 and 1991 and his testimony on the applicable standard of care should therefore have been admitted. Further, the plaintiff contends that Dr. Dworsky's

testimony should have been excluded by the trial court because he failed to demonstrate a modicum of familiarity with the medical community Gibson County or any similar community during the relevant time period.

Tennessee Code Annotated section 29-26-115 provides the essential elements the claimant must prove to prevail in a medical malpractice case in subsection (a) and sets forth the competency requirements for a medical expert witness in subsection (b):

> (a) In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Tenn. Code Ann. § 29-26-115 (2012 & Supp. 2013).

Generally, each of the elements in subsection (a) must be established by expert testimony.[3] *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002). The first element in subsection (a) requires the plaintiff to establish either the standard of care in the medical community in which the defendant practices or a similar community at the time of the alleged injury or wrongful act. Tenn. Code Ann. § 29-26-115(a)(1). This requirement, known as the "locality rule," has proven difficult for courts to interpret and apply over the years because the statute does not define "similar community" nor does it provide any guidance on how to

---

[3]Expert testimony is not required "where the proof is such that the jury can reasonably infer from common knowledge and experience that the defendant was negligent." *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999).

determine whether a community is "similar." *See Shipley v. Williams*, 350 S.W.3d 527, 538-39 (Tenn. 2011). As a result, the question of whether a medical expert has sufficiently established his or her familiarity with the defendant's medical community or a similar one is a frequently litigated issue in medical malpractice cases. *See id*. at 538.

In *Shipley v. Williams*, the Tennessee Supreme Court clarified the standards courts should use to determine whether a medical expert is qualified to testify in a medical malpractice case. The court explained that in its role as gatekeeper, the trial court must determine (1) whether the witness is competent to testify and, (2) whether the witness's testimony is admissible. *Id.* at 551. The competency requirements for a medical expert witness are set forth in Tennessee Code Annotated section 29-26-115(b), whereas the admissibility requirements come from the Tennessee Rules of Evidence–particularly Rule 702 and Rule 703. *Id.* at 550-51. Once the minimum requirements of each are met, questions about the extent of the witness's knowledge, skill, experience, training, or education bear on the weight of the testimony, not to its admissibility. *Id.* at 551.

In determining whether a medical expert witness is competent to testify, the *Shipley* court emphasized that trial courts should only look to subsection (b) of Tennessee Code Annotated section 29-26-115, not subsection (a). *Id.* at 550. Thus, the only grounds to disqualify a medical expert witness as incompetent to testify are:

> (1) that the witness was not licensed to practice in Tennessee, Georgia, Alabama, Mississippi, Arkansas, Missouri, Kentucky, North Carolina, or Virginia; (2) that the witness was not licensed to practice a profession or specialty that would make the person's expert testimony relevant to the issues in the case; or (3) that the witness did not practice this profession in one of these states during the year preceding the date of the alleged injury or wrongful act.

*Id.* (citing Tenn. Code Ann. § 29–26–115(b)).

Once the trial court determines that the medical expert witness meets the competency requirements of subsection (b), it must determine whether the witness's testimony can meet the admissibility requirements of Rule 702 and Rule 703. Rule 702 provides that a qualified expert witness may testify if his or her "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. Rule 703 provides guidance to the court in determining whether the facts and data relied on by the expert witness are sufficiently trustworthy. Tenn. R. Evid. 703. To meet the admissibility requirements, the locality rule requires that the proffered medical expert demonstrate a "modicum of familiarity" with the standard of care in the

medical community in which the defendant practices or a similar community at the time of the alleged injury or wrongful action. *Shipley*, 350 S.W.3d at 552. The witness must indicate the basis for his or her familiarity with the applicable standard of care; the bare assertion that he or she is familiar with it is insufficient. *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. Ct. App. 2006). Because the admissibility hurdles presented by Rules 702 and 703 are such frequently litigated issues, the *Shipley* court specifically clarified the evidentiary standards:

> Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.

*Shipley*, 350 S.W.3d at 552.

With the foregoing principles in mind, this Court will review trial court's decisions regarding medical expert witness competency and qualifications under an abuse of discretion standard. *Griffith v. Goryl*, 403 S.W.3d 198, 206-07 (Tenn. Ct. App. 2012); *see also Shipley*, 350 S.W.3d at 552 ("Tennessee continues to follow the majority rule and apply the abuse of discretion standard to decisions regarding the admissibility of evidence."). "A trial court abuses its discretion when it disqualifies a witness who meets the competency requirements of section 29–16–115(b) and excludes testimony that meets the requirements of Rule 702 and 703." *Shipley*, 350 S.W.3d at 552.

We evaluate the issues raised by the plaintiff in light of *Shipley*. In this case, neither party disputes that Dr. Gorrell meets the competency requirements set forth by Tennessee Code Annotated section 29-26-115(b). However, the parties dispute whether Dr. Gorrell's testimony demonstrated familiarity with the applicable standard of care sufficient to meet the admissibility requirements of Rules 702 and 703. In his testimony, Dr. Gorrell described his familiarity with Gibson County:

> Q.     Now, are you familiar with the demographics of this particular area?

A.     I am.

Q.     And what is your understanding of the population of Gibson County?

A.     If I'm – I remember correctly, somewhere around 55 to 58,000.

MS. COOPER: Your Honor, can we have this witness tell us what year he's referring to?

THE COURT: You may.  You have to tie it down.

THE WITNESS: I believe that's current.

BY MR. KINSEY:
Q.     Okay.  Now with respect to the hospitals in Gibson County, how many are you familiar with?

A.     I'm just familiar with Gibson County General.

Q.     Okay.  And approximately how many beds does Gibson County General have?

A.     I believe 55, 58.

. . . .

Q.     Okay.  And what is your understanding of the capabilities in 1991 in Gibson County General Hospital as related to deliveries?

A.     I believe there were two family practice physicians delivering and doing obstetric care there.  And there was a general surgeon who was their back-up for cesareans.

Q.     And in terms of the hospital itself, have you seen it?

A.     Been by it, yes.

. . . .

Q.     Now, based on – have you had an opportunity to review the deposition

-10-

of Dr. Jim and Dr. Larry in this case?

A.     I have.

Q.     And have you had an opportunity to review the medical records?

A.     I have.

Q.     And based upon your review of the medical records, your education and experience as an OB/GYN, and interacting with these family practice physicians, do you believe that you are familiar with the standard of practice, what a reasonable family practice physician would do under the same or similar circumstances that presented in this case back in 1991 in the same or similar community?

A.     I do.

The information in Dr. Gorrell's testimony is exactly the type of information described in *Shipley* as sufficient to establish "a modicum of familiarity" with the medical community in which the defendant practices. *Shipley*, 350 S.W.3d at 552. The defendants' central argument in their brief is that Dr. Gorrell failed to establish familiarity with a community similar to Gibson County in the requisite time frame. We note, however, that Dr. Gorrell need not do so. Although Dr. Gorrell had no first-hand knowledge of the standard of care in Gibson County in 1990 and 1991, he was familiar with pertinent statistical information about the community, the hospital, and the medical services and practices available in the area at that time. Under the relaxed locality rule of *Shipley*, this is permissible to qualify him to opine on the standard of care in Gibson County. *Id.* at 552. Based on the foregoing, we conclude that Dr. Gorrell met the competency requirements of section 29-26-115(b), as well as the admissibility requirements of Rule 702 and 703 and his testimony should have been admitted.

Our inquiry with regard to Dr. Gorrell does not end here. A party is entitled to reversal of the jury's verdict only if the trial court's error more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn. R. App. P. 36. If the trial court erred in excluding proof, its error is rendered harmless where the evidence ultimately finds its way into the record. *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 24 (Tenn. Ct. App. 1993). Given the standard of care testimony presented by the plaintiff's other witnesses, we think that the exclusion of Dr. Gorrell's testimony did not affect the judgment in this case. Though the plaintiff contends that Dr. Gorrell was an important expert on the applicable standard of care in this case, we fail to see any notable

distinction between his testimony and that of her two other expert witnesses on standard of care–Dr. Sharon Lee and Dr. Lee Rigg. The plaintiff did not make any offer of proof concerning the content of Dr. Gorrell's testimony following his exclusion. Additionally, in the plaintiff's Rule 26 Disclosure of Expert Witnesses, the substance of the opinions to be offered by each of the witnesses is identical. Without any indication in the briefs or record of how Dr. Gorrell's testimony would have differed from the testimony offered by Drs. Lee and Rigg, we must conclude that any standard of care evidence that Dr. Gorrell could have provided still found its way into the record through their testimony.

We turn now to the plaintiff's arguments that Dr. Dworsky's testimony on the applicable standard of care for the child's resuscitation should have been excluded under the locality rule. Neither party disputes that Dr. Dworsky meets the competency requirements set forth by Tennessee Code Annotated section 29-26-115(b). However, the parties dispute whether Dr. Dworsky's testimony demonstrated familiarity with the applicable standard of care sufficient to meet the admissibility requirements of Rules 702 and 703. Unlike the plaintiff with Dr. Gorrell, the defendants sought to qualify Dr. Dworsky as an expert witness solely through his familiarity with the standard of care in a similar community–specifically, Bessemer, Alabama. Dr. Dworsky testified about his experience practicing in Bessemer and its similarity to Gibson County:

A.      The – when I practiced in Birmingham from '83 to '89 as a neonatologist, I was the second neonatologist in the city to practice outside of the university system. There were six hospitals that my partner and I managed.

One that was closest to Gibson is a hospital called Bessemer Caraway. It's a hospital in the city of Bessemer, which is outside of Birmingham. It's a small, at that time, hospital that would have had about between 80 and 100 beds. They delivered about between 15 and 20 babies per month at that hospital. They were not – they were delivered by an obstetrician, not by family practice. And we took care of all the babies who were ill and some of the babies who were just well babies as well.

Q.      So Birmingham would be the closer higher level to Bessemer?

A.      Yes, it was about a 30-minute drive.

Q.      All right. So – I want you to assume that the nursery at Gibson General Hospital in 1990/1991 was a Level 1 nursery. Are you

familiar with Level 1 nurseries?

A.    Yes, ma'am, I currently run two Level 1 nurseries in Huntsville. We have three nurseries, two of them are Level 1s.

Q.    First of all, is the Bessemer Caraway facility where you practiced in the late '80s a Level 1 nursery?

A.    Yes, it is.

Q.    Tell the jury the difference between a Level 1 and a Level 2, and is the top, Level 3 nursery?

A.    Yes. The general structure of the nurseries really determine what types of babies they take care of. Just like in adult trauma, there are general hospitals that take care of simple automobile accidents and more specialized will take care of head trauma accidents and so forth.

In nurseries, a Level 1 nursery is designed to take care of newborns with minimal problems, the commonest problem is respiratory, the baby's lungs are not quite mature. Then those babies are typically sent to either a Level 2 or Level 3 hospital, depending on your area and what's available.

We – a Level 3 is a hospital that takes care of most everything. My particular hospital that I practice in now, the main hospital, is a Level 3 hospital that takes care of about 95 percent or 98 percent of all newborn problems.

Q.    If we go back to Bessemer Caraway, that was a Level 1 nursery, you said?

A.    Yes, ma'am.

Q.    And in settings similar to the one that we're here about today, based on your review of the records, would Brittany Evans, if she had been at Bessemer Caraway, have to be shipped to a hospital with a higher level of care?

A.    If she had been born as the records reflect at Bessemer Caraway, I would have gone to see her in my car. And then arranged for

transport to either St. Vincent Hospital or one of the other Level 3 hospitals in Birmingham at the time.

Q.     So similar to Gibson General Hospital in the 1991 time frame?

A.     Correct.

Dr. Dworsky went on to testify that the standard of care for resuscitating a newborn infant in Gibson County is essentially a national standard of care:

Q.     And when we talk about neonatal resuscitation, in your opinion, based on your experience in dealing with community hospitals all over North Alabama and your experience in Huntsville, is the manner in which a neonate is resuscitated, as we're talking about in Brittany Evans' case, different, whether you're in Huntsville or Trenton or Athens, or Knoxville, Tennessee?

A.     No. It shouldn't be. The experience of the providers may be different, but the – in the mid 1980s to late 1980s the Academy of Pediatrics and the American Heart devised a routine for taking care of babies who were having problems shortly after they were born. And that has pretty much followed across the country.

During his voir dire examination, Dr. Dworsky acknowledged that Bessemer is a part of the Birmingham metropolitan area, which has a population over a million. Despite the differences, Dr. Dworsky maintained that the medical facilities and practices in Bessemer were similar to Gibson County:

Q.     So you'd agree that the situation you were practicing in was not similar as it relates to Bessemer as it was to this situation here, would you not?

A.     I would not change the facts as they are. But whether they are similar or not, the hospitals are similar and the practices are similar.

The plaintiff contends that because Bessemer has a larger hospital than Gibson County and is in a larger metropolitan area, it cannot be a similar community. However, we have noted the importance of determining whether a community is "similar" should be evaluated

-14-

in the context of the medical procedures at issue. *See McDonald v. Shea*, No. W2010-02317-COA-R3-CV, 2012 WL 504510, at *15 (Tenn. Ct. App. Feb. 16, 2012) (rejecting the argument that Los Angeles and Memphis cannot be deemed similar medical communities because of their dissimilar populations). Thus, the facilities and equipment available in each community would be a more relevant inquiry than the population. Dr. Dworsky provided a sound explanation for his assertion that Bessemer and Gibson County are similar medical communities for purposes of evaluating the issues in this case. We therefore must reject the plaintiff's argument to the contrary.

The plaintiff also contends that Dr. Dworsky's testimony should be excluded because of his statements regarding a nationally recognized standard of care in neonatal resuscitation. *Shipley* expressly recognizes that, although the locality rule remains in effect, in many instances the national standard of care is representative of the local standard. *Shipley v. Williams*, 350 S.W.3d 527, 553 (Tenn. 2011). Medical experts in a number of past Tennessee cases have given testimony of a national standard of care applicable to medical care providers. *Id.* (citations omitted). We find this argument without merit.

### *Jury Instructions*

The plaintiff also takes issue with the jury instructions. She contends that the trial court's jury instructions overemphasized the plaintiff's burden of proof to the jury. Specifically, the plaintiff contends that the trial court erred by permitting "sudden emergency" and "hindsight" instructions to be read to the jury.

It is the trial court's duty to give the jury substantially accurate instructions with regard to every fact and theory raised by the pleadings and supported by the proof. *Ingram v. Earthman*, 993 S.W.2d 611, 635 (Tenn. Ct. App. 1998). Though the instructions should not contain inaccurate or inapplicable statements of legal principles that might confuse the jury, they are not held to a standard of perfection. *Id.* at 636. We review the trial court's jury instructions in their entirety and examine the challenged instructions in context. *Goodale v. Langenberg*, 243 S.W.3d 575, 584 (Tenn. Ct. App. 2007). We review the jury instructions through the eyes of an average lay juror, and we will not invalidate instructions as long as they fairly define the legal issues in the case and do not mislead the jury. *Ingram*, 993 S.W.2d at 636.

The challenged sudden emergency instruction was read to the jury as follows:

COURT:     A person who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy of judgment as a person acting under normal

circumstances who has time to think and reflect before acting. A person who is faced with a sudden emergency is required to act as a reasonably careful person placed in a similar position. A certain emergency will not excuse the actions of the person whose negligence created the emergency. If you find there was a sudden emergency that was not caused by any fault of the person whose actions you are judging, you must consider this factor in determining and comparing fault.

The plaintiff contends that the sudden emergency instruction was unnecessary because expert testimony at trial already considered any possible sudden emergency, and the standard of care already requires that sudden emergencies be considered. We disagree. This Court recently ruled that although the sudden emergency doctrine has a limited application in medical malpractice cases, it can be applied in medical emergency situations where it is warranted by the facts. *Olinger v. Univ. Med. Ctr.*, 269 S.W.3d 560, 568-69 (Tenn. Ct. App. 2008). The plaintiff contends that the sudden emergency instruction in this case was misleading regarding the standard of care because of the instruction's use of the term "person" rather than "physician." The plaintiff contends that the court did not instruct the jurors to account for the defendants' training and background. The plaintiff's argument fails to acknowledge that directly before the challenged sudden emergency portion of the instruction, the court stated that the plaintiff's burden was to prove that the defendants "failed to comply with the recognized standard of care of a physician" providing prenatal care and in labor and delivery. The court carefully set out the applicable standard of care later in the instruction as well. Furthermore, over the course of the trial, the jury heard from multiple witnesses from both sides testifying to the standard of care applicable to the defendants. We find no evidence in the record that the court's instruction misled the jury.

The court read the challenged hindsight instruction as follows:

COURT:     You must determine the defendants' conduct as of the time they were treating their patients in this case. You must not judge their care and treatment in retrospect, but hindsight or based upon what was learned or what happened after they made their decisions.

With regard to the challenged hindsight instruction, the plaintiff argues only that it was unnecessary because it was already covered by the instruction to evaluate the standard of care in terms of the relevant time period. The plaintiff does not cite authority for this proposition. We find no reversible error in the challenged instruction.

-16-

Our disposition of the issues to this point is sufficient to uphold the jury's verdict that the defendants did not breach the applicable standard of care. To the extent that the plaintiff's remaining issues concern issues of causation and damages, discussion of those issues is pretermitted.

### *Discretionary Costs*

The defendants contend that the trial court erred in denying their motion for an award of discretionary costs. Trial courts are given wide discretion in awarding discretionary costs under the rules of civil procedure. *Byrd v. Byrd*, 184 S.W.3d 686, 693 (Tenn. Ct. App. 2005). So long as the trial court applies the correct legal standard and reaches a decision that is not clearly unreasonable, we will uphold its decision. *Carpenter v. Klepper*, 205 S.W.3d 474, 490 (Tenn. Ct. App. 2006). Upon review of the record, we find no reason to disturb the trial court's decision.

### III. HOLDING

In sum, we find that although the trial court erred in excluding the standard of care testimony of Dr. Alan Gorrell, under the facts of this case it was a harmless error. We find no abuse of discretion in the trial court's decision to admit the testimony of Dr. Meyer Dworsky. We find no error in the trial court's jury instructions. Finding no error in the jury's verdict that the defendants did not deviate from the standard of care, we decline to address the plaintiff's issues with regard to causation and damages. Finally, we find no abuse of discretion in the trial court's denial of discretionary costs to the defendants.

We affirm the judgment of the trial court. Costs of this appeal are taxed one-half to the appellees, Jennifer Williams, James L. Williams II, and Med-South Healthcare and one-half to the appellant, Brittany Evans, by and through her attorney-in-fact, Mary Evans, her natural mother, and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-17-